# WILLIAM R. SCULLIN, by Next Friend, Appellant, v. WABASH RAILROAD COMPANY.

**Division Two, December 13, 1904.**

1. **NEGLIGENCE: Demurrer: New Trial: Appellate. Practice.** Where the court did not err in submitting the case to the jury in a negligence suit, it was error to sustain defendant's motion for a new trial on the ground that the court should have sustained a demurrer to the evidence.   And in this case, where the court granted defendant a new trial and plaintiff appealed, it is held that the court erred in granting that motion, and the cause is remanded with directions to set aside that order and to enter judgment in accordance with the verdict.

2. ———: ———: ———: **Pedestrian Along Railroad: Place of Injury: Public Highway: Trespasser: Diligence of Railroad.** Plaintiff was walking along a path that bordered a railroad track placed in a public highway.  The street fronted and bordered on the Mississippi river, and the path was along the opposite edge of the track, and beyond it was an elevated railroad framework which occupied a space of thirty feet in the street, and under this structure teams were constantly passing. Between the pillars of the elevated structure and defendant's surface railroad was a space six feet wide, along which pedestrians usually and necessarily traveled. *Held,* first, that the space was a public highway on which any pedestrian had the right to travel without being accounted a trespasser; second, the liability of the defendant railroad company for the conduct of its servants in handling its trains on the track in this street is very different from its liability in running its trains where it has an exclusive right-of-way and at places where its servants in charge of its trains have no reason to expect that persons may be on its tracks; and, third, there being no sidewalk or way exclusively reserved for pedestrians, defendant's trainmen were bound to anticipate that people would be on or near

the track in the street, and, as the track was on the surface and longitudinal, they were bound to know that pedestrians had a right to go across it at any point in the street, and their duty to be on the lookout was corresponding.

3. ———: Pedestrian: Place of Injury: Signals: Lack of Attention. Where a pedestrian is negligent in walking along a railroad track so close as to be certainly struck by an oncoming train, and gives no attention to signals, it is the plain duty of the trainmen seeing him for 600 feet to stop the train to avoid injuring him, whether he was a trespasser or not.

4. ———: Practice: Remarks of Attorney: Trespasser. It is not error for counsel in his argument to state that those in charge of a railroad train are required to look out for pedestrians on or near a track placed in a public highway, and are not required to do so if the track is a private way.

5. ———: ———: Admission in Pleading. It is not error to call the jury's attention to the fact that a certain controverted fact, to the effect that plaintiff was so close to the track as to be certain to be struck by an oncoming train if he remained there, was admitted in a former answer.

6. ———: ———: Experiments: Stopping Train. It is not reversible error for counsel to say in his argument that defendant railroad company could with the same train have determined within what distance the train could have been stopped, and could have had the results of that experiment testified to by witnesses. That is no such misstatement of the law as justifies a reversal.

7. ———: Excessive Verdict: $20,000. A young man not twenty-one years of age, lost both of his legs by being negligently run over by a train, and besides received a severe wound in the back. *Held*, that a verdict for $20,000 can not be said to be the result of prejudice or passion, and is consequently permitted to stand.

Appeal from St. Louis City Circuit Court.—*Hon. Jacob Klein*, Judge.

REVERSED AND REMANDED (*with directions*).

*John F. Shepley* and *Douglas W. Robert* for appellant.

(1) The doctrine announced in the opinion in the case of Holwerson v. Railroad, 157 Mo. 216, has been

repudiated.   Morgan v. Railroad, 159 Mo. 262.     (2)
Plaintiff was entitled to go to the jury.   Weller v. Rail-
road, 164 Mo. 180.   The exception to the rule that if
the plaintiff is guilty of contributory negligence he can-
not recover, i. e., that notwithstanding the fact that the
plaintiff is guilty of contributory negligence yet if the
defendant saw or by the exercise of ordinary care could
have seen the position of danger in which the plaintiff
was, and could thereafter, by the exercise of ordinary
care, have avoided the injury, the plaintiff is entitled to
recover, is well recognized in this State and is estab-
lished by a long line of  decisions.   Morgan v. Rail-
road, 159 Mo. 262; Chamberlain v. Railroad, 133 Mo.
587; Guenther v. Railroad, 108 Mo. 18, 95 Mo. 286;
Fiedler v. Railroad, 107 Mo. 645; Hanlon v. Railroad,
104 Mo. 381; Kellny v. Railroad, 101 Mo. 67; Dunkman
v. Railroad, 95 Mo. 232; Bergman v. Railroad, 88 Mo.
678; Conrad v. Railroad, 89 Mo. App. 391; Cooney v.
Railroad, 80 Mo. App. 226; Powell v. Railroad, 59 Mo.
App. 626.     (3)   Plaintiff was not a trespasser and had
a right to be where he was at the time of the accident.
Baker v. Railroad, 122 Mo. 533; Hanlon v. Railroad,
104 Mo. 381; Kellny v. Railroad, 101 Mo. 70; Dickson
v. Railroad, 101 Mo. 491; Conrad v. Railroad, 89 Mo.
App. 391.

*Geo. S. Grover* and *Boyle, Priest & Lehmann* for
respondent.

(1)   The demurrer to the evidence should have
been sustained.   Zimmerman v. Railroad, 71 Mo. 476;
Yancey v. Railroad, 93 Mo. 433; Sinclair v. Railroad,
133 Mo. 233; Watson v. Railroad, 133 Mo. 246; Kreis v.
Railroad, 148 Mo. 321; Holwerson v. Railroad, 157 Mo.
216; Morgan v. Railroad, 159 Mo. 262; Sharp v. Rail-
road, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497;

Hook v. Railroad, 162 Mo. 569; Van Back v. Railroad, 71 S. W. 358. (2) The court below should have directed a verdict in favor of the defendant at the close of all the evidence in the case. Authorities cited under point 1. (3) The court gave erroneous instructions at plaintiff's request. Authorities cited under point 1; Broom's Maxims, 216; Ins. Co. v. Tweed, 7 Wall. 52; Wharton on Negligence, sec. 138; Whitaker's Smith on Negligence, p. 324; Railroad v. Jones, 95 U. S. 442; Karle v. Railroad, 55 Mo. 482; Walsh v. Railroad, 59 Mo. 227; Moore v. Railroad, 126 Mo. 278; Payne v. Railroad, 129 Mo. 419; Boyd v. Railroad, 105 Mo. 371; Frazier v. Railroad, 81 Ala, 185; Murphy v. Deane, 161 Mass. 466; Nelson v. Railroad, 68 Mo. 597; Price v. Railroad, 72 Mo. 414; Bailey's Liability of Master to Servant, p. 374; Cooley on Torts (2 Ed.), 812; 7 Am. and Eng. Ency. Law (2 Ed.), 386, title "Contributory Negligence;" Murphy v. Railroad, 153 Mo. 252; Kelly v. Railroad, 75 Mo. 140; Central Bridge Corp. v. Butler, 2 Gray 130; Pease v. Cole, 53 Conn. 53; Heimann v. Heard, 62 N. Y. 455. (4) The court refused correct instructions asked by defendant. Maxey v. Railroad, 113 Mo. 1; Zimmerman v. Railroad, 71 Mo. 476; Yancey v. Railroad, 93 Mo. 432; Kelsay v. Railroad, 129 Mo. 362; Lane v. Railroad, 132 Mo. 40; Hayden v. Railroad, 124 Mo. 566; Watson v. Railroad, 133 Mo. 246; Hanlon v. Railroad, 104 Mo. 381; Boyd v. Railroad, 105 Mo. 371, and cases cited under point 1. (5) Counsel for plaintiff was clearly guilty of misconduct in his closing argument to the jury. Evans v. Trenton, 112 Mo. 390; Robertson v. Railroad, 152 Mo. 382.

GANTT, P. J.—This is an appeal from an order of the circuit court of St. Louis granting the defendant a new trial. The action was for damages for personal injuries sustained by the plaintiff and alleged to have

been caused by the negligence of defendant.   The evidence was substantially as follows:

About 9:30 in the morning of May 11, 1899, the plaintiff, a young man, was in the employment of the Wiggins Ferry Company, in the city of St. Louis.   He started to walk from Mound street, in the northern part of the city, south to Market street, a distance of some twenty blocks, for the purpose of reaching the landing of a ferry boat, which was plying between the foot of Market street and the United States gunboat, "Nashville," which was at that time anchored out in the channel of the Mississippi river near the Illinois shore.   His course was down the levee, or Front street, a public highway, and along a path ordinarily used by pedestrians on that part of the levee, which ran parallel with and about a foot west of the western rail of the defendant railroad company's track, and this course he held until he was struck by defendant's train near the foot of Franklin avenue, which is about ten blocks south of Mound street.   On his way down he spoke to defendant's watchman at Biddle street, which latter street is about 1,600 to 1,800 feet north of Franklin avenue.   He never changed his position with reference to the west rail of defendant's track, which is laid longitudinally along and on the surface of the levee between Mound street and Franklin avenue.   He walked close to the track all the way down and had been so walking about fifteen minutes when he was struck.   He testified he did not look backwards for the train, but was listening.   He had his ears open and could have heard a bell or whistle if there had been any signal—the idea of a train being near him did not enter his head.   As a usual thing, engines when moving about the yards, where he worked, rang a bell, but he didn't know about their blowing whistles.

A passenger train of the defendant backed down over this track of the defendant towards the south, and when plaintiff was forty or fifty yards north of the foot

of Franklin street, it overtook him and the southern end of the rear car struck him in the back, knocking him down, and in a position where both the wheels of the southern truck of said car passed over his legs, crushing and mangling both of them, so that it was necessary to amputate the left leg above the knee and the right one just above the ankle. He received a deep wound in the back which did not heal for two months. The evidence on the part of the plaintiff tended to prove that no whistle was blown, or bell rung, or other signal given, of the approach of the train, and he heard no sound of the train approaching. When the train stopped, the plaintiff was found lying from six to eight feet north of the northern wheel of the southern truck of the car. The distance from the extreme southern end of the car to the northern edge of the northern wheel of the truck which passed over him was fifteen feet and seven inches. He was taken from under the car and put upon a couch on the levee, where he remained an hour waiting for an ambulance to take him to the hospital where the amputation was performed. He remained in bed two months. Since his recovery he can only walk with artificial legs, and can not go faster than a walk or ascend or descend steps more than one step at a time or walk with any certainty.

The Wabash train which struck him was the regular south-bound morning train, and was on time that morning. The engine was at the north end. The testimony on the part of the defendant tended to prove that the engine bell was ringing and that the engineer and fireman were at their places on the engine. This train was composed of a small passenger eight-wheel locomotive, weighing about thirty to thirty-two and one-half tons, a combination baggage car and smoker and a passenger coach. The cars and locomotive were equipped with air-brakes operated through the same pipe. The train was moving from six to eight miles an hour. The day was fair and the track dry. The

train could be controlled from the engine or from the rear platform of the rear car with a device known as a "tail-hose."

The end of the hose was conveniently placed, as was the brake, so that either hose or brake could be quickly used by the conductor in an emergency. At the time of the accident and prior thereto, the conductor of the train stood on the south platform all the way from Mound street to the place of the accident. There was a whistle attached to the hose, and the evidence for defendant tended to prove that the conductor held the air hose and brake in his hand that morning all the way from Mound street down to the point of the accident, and that the conductor whistled three times with the air hose, and after crossing Wiggins Ferry tracks he whistled two long and two short blasts. The train then ran two hundred feet and the same whistle was repeated by the conductor and he repeated it once more before the accident.

John Watt, a witness for plaintiff, testified that he had been a locomotive engineer on the Illinois Central for nine years and that such a train as that described by the witness in this case, upon such a grade upon such a day and running at such a speed, could be stopped, if fully loaded with passengers, within ten or twelve feet, or, if empty, within about one foot less space.

On the rear platform with Mr. Maroney, the conductor, was Richard T. Blow, a passenger. Blow stood on the west side of the platform and Maroney on the east.

The track from Biddle street to the point where the accident happened is almost straight, and its entire length can be seen from a point between the rails at Biddle street down to the Eads bridge, three blocks south of Franklin avenue.

On the day of this most unfortunate occurrence, the gunboat "Nashville" was lying in the harbor of

St. Louis and excited much interest. It seems that almost every one on the train was trying to catch sight of it and various witnesses testified that the conductor, like the others, was occupied in looking at it, and thus had his attention taken from the track in front of him, near which plaintiff was walking, so near, according to his own and the evidence of other witnesses, that he was sure to be struck if he was not warned and did not move further west as he walked. On the part of the defendant the conductor testified that when he first saw plaintiff, plaintiff was 600 or 700 feet south of the rear end of the train, walking south, on a line three or four feet west of the west rail of the Wabash track; that he then sounded the alarm whistle or hose whistle; that he was not then near enough to the track to be in danger from the train; that this whistle was sounded three times, four whistles at a time; that plaintiff did not change his course until the train had come within twelve or fourteen feet of him when he stepped toward the track and into a position where he would necessarily be struck, and seeing this the conductor applied all the air and endeavored to reach and catch the plaintiff, but failed and the train struck him and ran over him.

On this point there is sharp and well defined conflict between the plaintiff and his witnesses on one side and the conductor on the other. Plaintiff and his witnesses say he was walking all of this 600 feet within a foot of the west rail. On this point also the plaintiff read in evidence the original answer of the defendant in which the defendant alleged "that on the 11th day of May, 1899, William R. Scullin was walking south about one foot west of and along the side of the west rail of the said defendant's railroad track, where said Franklin avenue enters said Front street or wharf in said city of St. Louis, and that one of defendant's trains was then running south on said track." There was also a marked conflict as to whether the con-

ductor was looking at the gunboat at the time just prior to the train's striking plaintiff.

Joseph Dwyer, John Ray, John Young and Oscar Wendt testified that both Blow and the conductor were looking at the gunboat or towards the river where the "Nashville" lay at that time. The conductor denied he was looking at the gunboat, and Mr. Blow testified that he did not observe whether the conductor was looking or not. He himself was looking at it—that he and the conductor spoke about the gunboat. He would say that the conductor was looking ahead of his car.

The levee sloped upwards from the water's edge to the railroad tracks, the westernmost of which are those of the Wabash upon which the accident happened. Immediately west of the latter tracks are the supports of the structure of the elevated railroad. The space under the elevated railroad is thirty feet wide, and is used principally by teams, which pass there constantly. West of the elevated railroad at this point is a triangular space formed by the western row of piers of the elevated structure, the fence of the Wabash yards and Franklin avenue. There is no sidewalk here and the street is paved with rough granite, like the rest of the levee. The elevated structure and the fence of the Wabash yards come together at a point some distance north of Franklin avenue, leaving only the space about six feet in width on the levee between the Wabash track and the footings of the elevated structure for a pathway. Everybody uses this as such, and this is where the plaintiff was walking at the time he received his injuries.

The cause was submitted to the jury under instructions from the court, and the jury returned a verdict for the plaintiff and assessed his damages at $20,000. Defendant in due time filed its motion for a new trial, and the circuit court granted a new trial on the ground that it should have sustained a demurrer to the evidence, and that it had committed error in submitting

the case to the jury at all. From this order and judgment granting a new trial the plaintiff appeals.

## I.

Did the court err in submitting the case to the jury? If it did not, it erred in granting the new trial. To properly determine this question the place where the injury occurred must be kept in view. It was on a public highway, the street fronting and bordering on the Mississippi river in the city of St. Louis. On this street the city authorities have permitted an elevated railroad to be constructed, which occupies a space over thirty feet wide and under this structure teams are constantly passing. About six feet east of the foot of the pillars on which the elevated railroad rests, the defendant company has constructed and operates its railroad on the surface of the street and longitudinally north and south. The evidence shows that pedestrians usually and necessarily travel on this space between the pillars of the elevated railroad and defendant's tracks. The space then was a public highway on which plaintiff and any citizen had the right to travel without being accounted a trespasser. While the defendant had the right to lay its tracks on said street by and with the consent of the municipal authorities, its liability for conduct of its servants and employees in handling its trains on this street is very different from its liability in running its trains where it has an exclusive right-of-way and at places where its servants in charge of its trains have no reason to expect that persons may be on its tracks.

In Moore v. Railroad, 126 Mo. l. c. 274, while conceding the superior right of the railroad company on its tracks in a public street, this court said: "But, at the same time, those in control of the cars must exercise a reasonable degree of watchfulness, care and caution to discover persons on the track, or so near

thereto, as to render their position perilous or themselves in danger of injury from the cars, taking into consideration the surroundings, time and place, and certainly a greater degree of watchfulness is required in a part of the city thickly populated than where thinly settled.'' In Oates v. Railroad, 168 Mo. l. c. 544 et seq., this court, through Judge MARSHALL, said: ''The sum of the adjudicated cases bearing upon the relative rights and duties of street cars and citizens travelling in vehicles drawn by horses or other animals is, that both have a right to use the street, but neither has an exclusive right.''

In Eswin v. Railroad, 96 Mo. l. c. 297, Judge BLACK, speaking for this court, said: ''Here both the company and the public have a right to the use of the street. The company must know that persons will be, and have a right to be, upon the street, and hence a duty arises to obey these reasonable municipal regulations, and to keep watch to avoid collisions and accidents. The duty of the company to look out for persons on the track is just as great as the duty of the individual to look out for trains, the difference being that the person must give way to the train, which, in the nature of things, can not be stopped instantly.'' A principle so obvious as this would seem not to require reasons or authorities to support it.

In Frick v. Railroad, 75 Mo. l. c. 609, this court said: ''It has been repeatedly held by this court that greater care is to be exercised by the persons managing a train of cars, within the limits of a town or city, than is required in the country.'' [Brown v. Railroad, 50 Mo. 461; Maher v. Railroad, 64 Mo. 276; Hicks v. Railroad, 64 Mo. 439.]

A less degree of vigilance will ordinarily be required between the streets of a town or city, than will be required at the street crossing, or *when running longitudinally in a street.*'' .

It was proved that the course pursued by plaintiff was parallel to and very close to the western rail of defendant's track and was along a well-worn path usually taken by pedestrians up and down the levee and for a great part of this distance there was no sidewalk or way exclusively reserved for pedestrians. This street was unquestionably a place where the employees and trainmen of the defendant were bound to anticipate that people would be on or near the tracks in the street, and as the tracks were on the surface and longitudinal they were bound to know that any citizen had a right to go across them at any point in the street, and their duty to be on the lookout was corresponding. The route which the plaintiff took brought him within the sight of the conductor on the rear end of the train for at least one thousand feet. Indeed the conductor says he saw him for six hundred feet. Now, if, as the jury must have found, plaintiff during all that time was so near to the track that a train on it would be bound to strike him and the conductor saw him in that position, it was the plain duty of the conductor to warn plaintiff of his danger, and this the conductor says he did, but that the plaintiff was not then in danger. But the jury evidently found that the plaintiff was in a position of imminent danger of being struck by the train, and that after he was in such position the defendant's servants in charge of said train either saw or by the exercise of ordinary care could have seen him in such position and could have, by the exercise of ordinary care, averted the injury. With the evidence before them it was the province of the jury to determine this controverted fact. Of course, as the court instructed the jury, if the jury had believed the conductor and that the plaintiff was not in any danger until the train came within twelve or fourteen feet of him and then suddenly passed on the track in front of this moving train without looking to see what he was doing and too late for the conductor by the use of the means at hand to avert

the injury, then he could not recover. This was the defendant's contention, but the jury found against it and there was ample evidence from which they could so find. Indeed the first answer practically admitted the plaintiff was in such perilous position, because it was admitted that the width of the car took it *two feet and one inch* outside of the rail and the answer alleged "that he was walking about one foot west of the west rail," but whether the answer admitted it or not, the other witnesses and plaintiff testified that he walked about one foot from the west rail all the time and the day was bright and clear and the conductor stood where, if he had looked, he could not have avoided seeing him. Granting that plaintiff was negligent in walking along so close to the track, if it was evident to the conductor for 600 feet that he was doing so and that he paid no attention to the signals, if they were given as testified to by the conductor, then it was the plain duty of the conductor to check or stop his train and not injure plaintiff. That he could have done so in time to have prevented the collision is plain, if we are to credit plaintiff and his witnesses, and evidently the jury did.

Even if plaintiff had been a trespasser on the tracks at this point, and *he was not,* still if the conductor saw, or by the exercise of ordinary care could have seen him in time to have averted the injury to him, it was his bounden duty in the circumstances and at the place to have done so, and averted the injury to plaintiff. This is too well-settled law in this State to require any further discussion of it. [Hanlon v. Railroad, 104 Mo. 381; Chamberlain v. Railroad, 133 Mo. 587; Fiedler v. Railroad, 107 Mo. 645; Kellny v. Railroad, 101 Mo. 67; Morgan v. Railroad, 159 Mo. 262; Sinclair v. Railroad, 133 Mo. 233; Klockenbrink v. Railroad, 172 Mo. 687; Fearons v. Railroad, 180 Mo. 208; Kreis v. Railroad, 131 Mo. 544.]

Accordingly we hold the trial court properly submitted the case to the jury under instructions which

announced the foregoing principles and erred in setting aside the verdict. The recent expression of this court in Morgan v. Railroad, 159 Mo. 262, demonstrates that this court has not abandoned what counsel has pleased to denominate "the humanitarian doctrine," and we have no disposition to weaken its force by further argumentation.

## II.

We next inquire whether there was reversible error in the remarks of Mr. Shepley, counsel for plaintiff. We have examined his statement and in substance it was that when the company filed its first answer it admitted what plaintiff claims as to his being within a foot of the track was true, and it did not withdraw that statement until "it found out it was not on its private property but a public highway, and has not the right to run people down without looking for them as they would in their private way. By that I mean to say on their own right-of-way people are trespassers, but on a public highway you and I have just as much right as the railway company and they are bound to look out for us." When asked what his exception was, counsel for defendant said, "The statement you have made in regard to the rights of parties and the right to run people down on their own right-of-way." To which Mr. Shepley replied, "Well, I explained it to them, your Honor; I simply state that they did not have to look out for them; they had a right to presume that trespassers would not be there, which they would not on a public right-of-way. This is all I meant and I think the explanation shows it." Another statement was that "the defendant could have gone to the scene of the accident and with this same train have determined within what distance they could have stopped the train and brought their witnesses here and had them swear to it."

We think there was no such violation of the rules

of legitimate argument in either of these statements as amounted to error. Counsel have furnished us with no citation of authority to show that either statement was a misstatement of the law. Certainly the first was not, and we are not advised of any rule of evidence which prohibits either side from making experiments under like circumstances and conditions and showing the result to the jury. It is very often done. This point also must be ruled against defendant.

## III.

Without reproducing each of the instructions it is sufficient to say that those given by the court are in harmony with the views herein expressed, and those asked by defendant in the nature of a demurrer to the evidence were properly denied, and the others refused were in conflict with what has been said in this opinion.

## IV.

The amount of the verdict is not urged in this court as excessive. It was made a ground for new trial, but the circuit court did not grant the new trial on that ground. The verdict is a large one, but when we consider that defendant was a young man who had not reached the age of twenty-one years, had lost both of his legs by the injury, and is doomed to hobble through life a hopeless cripple, and also suffered a terrible wound in his back, we can not say the verdict is so excessive as to indicate passion or prejudice and hence it is not our right to interfere with it. The suffering, both physical and mental, from such injuries is necessarily great and the consequences permanent.

As already indicated, the circuit court erred in granting a new trial and its judgment in so doing is reversed and the cause is remanded with directions to set aside the order granting a new trial and to enter judgment for the plaintiff in accordance with the verdict.

All concur.